## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

JLP PARTNERS, LLC, individually and on
behalf of all others similarly situated,

 *Plaintiff*,

v.

HUSCH BLACKWELL LLP, a Wisconsin
limited liability partnership,

 *Defendant*.

Case No.:

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff JLP Partners, LLC ("Plaintiff" or "JLP"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Husch Blackwell LLP ("Defendant" and/or "Husch Blackwell") and alleges as follows:

### INTRODUCTION

1. This class action concerns the gross mismanagement of Visionary Private Equity Group I, LP ("VPEG" or the "Fund"), a private equity fund that was a vehicle for self-dealing and fraud by its principals. As a result, Plaintiff and the class suffered substantial losses.

2. VPEG raised approximately $90 million from approximately 1,000 investors, many of whom were retail investors who invested their retirement savings through self-directed IRA accounts.

3. VPEG represented to its investors that the company would deploy their capital into a portfolio of promising private companies in diverse sectors. In reality, VPEG misappropriated millions of dollars of investor money to its principals and to affiliated companies, and misused investor funds to cover payments to other investors in Ponzi-like fashion.

4.      To conceal VPEG's misconduct and further induce prospective and current investors to contribute new capital to VPEG or maintain their investments in the Fund, VPEG disseminated inflated valuations of its portfolio companies and inflated projected receipts from said companies based on bogus methodologies.

5.      Since 2021, VPEG paid approximately $1.6 million to Visionary Fund Manager, LLC ("VFM"), an affiliated entity owned and controlled by VPEG principals Dr. Ronald Zamber ("Zamber") and Michael Cosby ("Cosby"), in purported management fees. The basis, calculation, and ultimate disposition of those payments were not adequately disclosed to investors.

6.      VPEG's misconduct could not have succeeded but for the material aid of Husch Blackwell and its partner, Cosby.

7.      Cosby served as VPEG's General Counsel.

8.      But Cosby was far more than a passive advisor to the Fund. He also served as VPEG's Senior Managing Director, and in this capacity was responsible for and materially involved in the subscription process through which VPEG obtained new investors—and by extension, new capital.

9.      Cosby was also in charge of the Fund's finances. He prepared the Fund's tax returns, and he co-controlled the Fund's bank accounts. Over the years he executed numerous wire transfers misappropriating millions of dollars in investor capital to a variety of improper destinations. Simply put, Cosby was intimately embedded in VPEG's operations and misconduct.

10.      Cosby's law firm, Husch Blackwell, served as outside counsel to VPEG. The VPEG subscription booklet provided to JLP identified Husch Blackwell as the Fund's legal counsel "in connection with the management and operation of the Partnership, including, without limitation, making, holding, and disposing of investments."

2

11.     Husch Blackwell played a central and substantial role in the subscription process necessary to complete JLP's and others' VPEG investments. The subscription booklet used to complete JLP's investment directed potential investors to submit their completed subscription paperwork to "Husch Blackwell LLP, 901 St. Louis, Ste. 1800, Springfield, MO 65806, Attn.: Michael A. Cosby" and instructed investors to direct questions to "Michael A. Cosby ((417) 268-4000) of Husch Blackwell LLP." The subscription booklet further stated that, following acceptance of a subscription, the investor would receive a copy of an opinion from Husch Blackwell in connection with the investment.

12.     Through its representation of VPEG, its participation in the subscription process described below, and the knowledge of its partner Cosby attributable to the firm as alleged below, Husch Blackwell acquired actual knowledge of VPEG's fraud and breaches of fiduciary duty.

13.     In spite of this knowledge, Husch Blackwell substantially assisted VPEG's misconduct, all the while collecting legal fees from VPEG.

14.     VPEG's misconduct came to a head when its bogus projected company valuations failed to materialize, its undisclosed debts came due, and VPEG failed to pay hundreds of thousands of dollars of obligations to, among others, its landlord, insurance carrier, and various other contractors and vendors.

15.     In June 2025, a receiver (the "Receiver") was appointed over VPEG and VFM. *See Oliver and Co. v. Zamber*, E.D. Mo. No. 25-cv-132 (hereafter, "Oliver Dkt.") at ECF No. 88 (Mem. and Order dated June 4, 2025). Amongst other findings of gross misconduct at VPEG, the presiding judge stated that the VPEG principals' conduct "sounds criminal to me." *See* Oliver Dkt. at ECF No. 82 at 193:25 (Hrg. Tr. dated April 28, 2025).

**PARTIES**

16.     Plaintiff JLP Partners, LLC ("JLP") is a limited liability company formed under the laws of the State of Washington. JLP's members are Laurie Benezra-Arron, an individual domiciled in the State of Texas, and Paul Benezra, an individual domiciled in the State of Washington.

17.     Defendant Husch Blackwell is a Wisconsin limited liability partnership with its principal place of business in St. Louis, Missouri. Defendant may be served through its registered agent C T CORPORATION SYSTEM, located at 5661 Telegraph Rd Ste 4B, St. Louis, MO 63129-4275.

**JURISDICTION AND VENUE**

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, because this is a class action in which: (a) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (b) there are more than 100 members of the proposed class; and (c) at least one member of the proposed class is a citizen of a state different from the Defendant.

19.     Venue is proper in the district under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this District, including the Fund's operations and Husch Blackwell's activities in connection therewith. Additionally, Defendant Husch Blackwell operates its principal place of business in this District.

**FACTUAL ALLEGATIONS**

**I.      VPEG's Formation, Structure, and Key Personnel**

20.     VPEG is a Missouri limited partnership formed in January 2010. The Fund was formed as a private equity vehicle that purported to pool investor capital and deploy it across a

diversified portfolio of private companies in sectors including technology, healthcare, energy, consumer products, and entertainment.

21.     VPEG was managed by Robert Grenley, Dr. Ronald Zamber, and Cosby.

22.     Grenley was the Fund's Director of Capital Development. Grenley was responsible for investor relations, fundraising, and marketing the Fund to prospective and current investors. Grenley communicated directly with investors, including Plaintiff, regarding the Fund's performance, anticipated liquidity events, and purported urgency of investment opportunities.

23.     Zamber and Cosby controlled and directed VPEG's activities primarily through VPEG's general partner, Visionary PE GP I, LLC, and through VPEG's manager, VFM, both of which were themselves owned and controlled by Zamber and Cosby.

24.     Zamber is an ophthalmologist who resides in Fairbanks, Alaska, where he operates the "Eye Clinic of Fairbanks."

25.     Zamber was VPEG's Chairman and Senior Managing Director. He directed the Fund's investment strategy, and together with Cosby, co-controlled its bank accounts and authorized transfers of the Fund's assets.

26.     Zamber was the primary decision-maker when it came to the Fund's operations. He had authority to direct Cosby to execute wire transfers, and he frequently exercised that authority to direct Cosby to transfer investor money from the Fund's bank accounts for his personal benefit and for the benefit of affiliated entities.

27.     Cosby was VPEG's Senior Managing Director and General Counsel. In this capacity Cosby oversaw VPEG's subscription process through which new investments were made and new capital was raised. He also managed the Fund's legal affairs, prepared its tax filings, and as noted above, co-controlled the Fund's bank accounts with Zamber.

28.     Cosby was a partner of law firm Husch Blackwell in its Springfield, Missouri office until his separation from the firm following the events described below. Husch Blackwell employs over 1,000 attorneys, maintains locations in over 20 cities across the United States, and claims that it is ranked one of the "Top 100" law firms in the country according to the 2025 Am Law 100 rankings.

29.     The VPEG subscription materials provided to JLP and others emphasized Husch Blackwell's involvement with the Fund. Cosby held himself out as a Husch Blackwell partner, and the subscription booklet used in connection with JLP's investment identified Husch Blackwell's office, contact information, and firm name.

## II.     VPEG's Obligations Under its Limited Partnership Agreement ("LPA")

30.     VPEG was governed by an LPA that vested its general partner, Visionary PE GP I, LLC, with broad authority, granting it the "right, power, and authority" in managing the Fund's business affairs.

31.     The LPA required VPEG's books and records to be maintained in accordance with generally accepted accounting principles and required an annual audit by an independent certified public accountant. VPEG's private placement memorandum (the "PPM") likewise represented that the General Partner would use its best efforts to provide limited partners with quarterly fair value statements and, within 120 days after the close of each fiscal year, annual financial statements audited by an independent public accountant. The PPM also assigned the Fund Manager responsibility for quarterly reporting and annual audit coordination. Despite these requirements and representations, VPEG has not been subject to an independent audit since 2011.

32.     The LPA also contained provisions governing distributions to limited partner investors, requiring that they follow a three-step waterfall: first, to limited partners (investors);

second, to the general partner; and third, residual proceeds to be split 80% to limited partners and 20% to the general partner. Since 2021, non-insider limited partners received only approximately $3 million in distributions, while VPEG separately paid approximately $7.5 million to Zamber, Grenley, Cosby, and VFM. As alleged below, many of those payments were undisclosed and were made for personal or affiliated purposes.

33.    The LPA provided for a consulting fee payable quarterly to VPEG's general partner, calculated at an annual rate of 1.5% of the value of the limited partners' capital accounts. The PPM separately stated that the general partner would pay VFM a quarterly consulting fee under terms established between those entities. The PPM also represented that, on an ongoing basis, the general partner and VFM would bear their own overhead expenses without reimbursement from the Fund, while the Fund would remain responsible for specified legal, audit, valuation, and other professional expenses incurred in managing the Fund and evaluating investments. Since 2021, VPEG paid approximately $1.6 million to VFM in purported management fees, but the basis, calculation, classification, and ultimate disposition of those payments were not adequately disclosed to investors.

## III.    VPEG's Representations to Investors

34.    VPEG made materially similar representations and omissions to prospective investors to induce their investments in the Fund. These representations misstated and/or omitted material information concerning VPEG's operations and performance, as described in more detail below.

35.    In VPEG's PPM, among other places, VPEG represented to investors that the Fund used investor capital to invest in a diversified portfolio of investments in promising private

companies across multiple sectors including healthcare, technology, energy, and consumer products.

36.     VPEG represented to investors that the Fund's portfolio investments were performing well and that liquidity events, including anticipated distributions from portfolio company exits, were imminent. To the extent the communications and projections alleged below postdate JLP's May 2023 investment, they are included as evidence of the continuing fraudulent scheme, the principals' knowledge and concealment of VPEG's true condition, and the solicitation of later Class members, rather than as statements on which JLP relied in making its May 2023 investment.

37.     In support of such representations, between 2024 and 2025, Zamber and Grenley prepared at least 28 versions of a spreadsheet projecting purported distributions from portfolio companies. These projections were sent to prospective and current investors, including Plaintiff. With each successive version, projected liquidity events were pushed farther into the future and expected returns shrank, while near-term projections never materialized.

38.     The projected distributions were wildly unrealistic. For example, Version 19 of the spreadsheet, dated December 2024, projected:

   a.   $10 million from POP! Gourmet LLC ("POP! Gourmet")—a company for which Grenley served as CEO. In reality, POP! Gourmet was in the process of a sheriff's sale to satisfy a judgment, had no employees, and had no manufacturing operations;

   b.   $20 million from Shop4E Inc. ("Shop4E")—a company for which Grenley was also CEO. This projection was made despite the fact that Shop4E had zero revenue for three consecutive years and its bank account had been closed for inactivity in April 2024; and

   c.   $50 million from Visionary Media Group, which had zero revenue and millions in accumulated losses.

8

39.     The most recent version of the spreadsheet still projected $10 million from POP! Gourmet in 2027, $10 million from Shop4E in 2027, and $10 million from a company named "Victory Clean Energy" in 2025—plus another $50 million from Victory Clean Energy supposedly to be realized in 2026-2027. At this same time, Victory Clean Energy's SEC filings expressed doubt about its ability to continue as a going concern.

40.     In addition to the spreadsheets, VPEG circulated other marketing materials with grossly inflated or false claims about portfolio companies. For example:

a.  A 2023 investor update represented to investors that portfolio company "Fortior Solutions" had "$12M+ in ARR from government contracts" and that "at scale, each shipyard account will generate $8M in ARR," with a total pipeline that could result in Fortior approaching "$1B in value." The government contracts that were claimed to exist in this update never in fact materialized.

b.  A 2023 investor update represented to investors that portfolio company Victory Clean Energy was in the "late stages of a reverse merger with largest, low-cost green hydrogen producer in North America" and that each hydrogen facility would yield "$50-60M in value for VPEG" with "16 facilities planned over next 7+ years" with a market value of "$500M-1.8B+ per facility." Despite the claims of a "late stage" merger, no profits from Victory Clean Energy were ever realized for VPEG investors.

c.  A 2023 investor update represented to investors that portfolio company Visionary Media Group's subsidiary "Evernova" was "expected to add several hundred million dollars in value." This projection was entirely without basis and likewise never materialized.

41.     All the while, investors were repeatedly told that the Fund would "soon close" and that the window to invest at $1.00 per share was ending, creating a false sense of urgency to pressure investors into investing and/or committing additional capital.

42.     In reality, VPEG continued to accept new investors well after such representations were made, and starting in 2023 or 2024, offered shares to investors at a rate of 1.5 units per dollar (effectively $0.67 per share) through "buy-one-get-one" promotions offered to Plaintiff and others. This course of conduct directly contradicted the Fund's previous representations that had expressed

supposed urgency to invest. Moreover, soliciting additional investment in this fashion improperly diluted the interests of earlier investors, including Plaintiff, without consent and in violation of the terms of VPEG's offering and marketing materials. VPEG relied upon these dilutive offerings to, in part, redeem complaining investors to silence negative chatter and cover for VPEG's principals' misconduct.

## IV.     VPEG's Principals Misappropriated the Fund's Assets

43.     VPEG diverted a significant portion of investor capital for the benefit of VPEG's principals and affiliated entities they owned or controlled. These diversions were not disclosed to investors and were contrary to VPEG's stated claims as to how investor capital would be deployed.

44.     Since January 2021, VPEG has received approximately $55 million in cash receipts, including but not limited to approximately $43.5 million from external investments and an additional $8.1 million in distributions from portfolio companies.

45.     During that same time period, VPEG's cash expenditures totaled $57.4 million, meaning VPEG spent approximately $2 million more than it took in.

46.     Of those expenditures, approximately $4.7 million was paid directly to Zamber, $734,000 to Grenley, and $655,000 to Cosby. The approximately 1,000 limited partner investors, however, received only approximately $3 million in distributions during the same period—less than half of the amount paid to VPEG's insiders.

47.     The payments to Zamber were often ad hoc and were made following text message exchanges with Cosby, who co-controlled the Fund's bank accounts with Zamber. Examples of Zamber's text messages to Cosby include:

- "I will need a wire for $270k (deferred compensation) today if possible" (October 19, 2021);

10

- "I need a $30k wire today for deferred compensation to cover payroll" (February 9, 2022);

- "I need a $25k wire today" (August 24, 2022);

- "Just got a huge surprise at the clinic, I need a $15k wire asap" (November 9, 2022);

- "Will need $12k wire for Grenley and $15k wire for RZ" (January 18, 2024); and

- "Please set up a $10k wire to RZ. Will revert if funding happens today or tomorrow." (November 12, 2024).

VPEG's bank records labeled these transfers as "Director Fees" or "Consulting Fees," notwithstanding the personal purposes reflected in the contemporaneous text messages.

48.    New investor capital was often distributed to VPEG's principals almost immediately upon its arrival into the Fund's coffers. For example, a $25,000 investor deposit arrived in VPEG's account from IRA custodian NuView IRA and, on the same day, Zamber texted Cosby directing payments of $15,000 to Zamber, $500 to Grenley, and $5,000 to a third party, leaving less than 20% of the investor's funds available for deployment into VPEG's supposed investment strategies.

49.    Fund investors' capital was misused in other fashions, too. For example, Zamber used Fund capital to pay individuals with whom he had personal relationships, even though those individuals provided no services to the Fund.

50.    According to the Receiver appointed over VPEG, Zamber paid "exorbitant 'advisor fees'" ranging from $10,000 to $20,000 *per month* to associates in the media industry to cultivate a reputation as a media mogul and set up connections and opportunities in the entertainment industry for his son. These payments had no connection to VPEG's supposed investment strategy.

11

51. VPEG also expended investor capital on services untethered to any legitimate Fund purpose. For example, VPEG paid the public-affairs firm Bose Public Affairs Group a retainer of $25,000 per month beginning in November 2018 (later reduced to $16,250 per month in January 2020) for purported lobbying on behalf of an unidentified portfolio company. VPEG's own personnel could not determine why the Fund, rather than the portfolio company, was footing the bill, and Zamber directed that the invoices be routed to Cosby. *See Oliver Dkt.* at ECF No. 82, Hrg. Tr., at 116:6–118:19.

52. Zamber's misappropriation of Fund assets for personal use also extended to his private medical practice in Fairbanks. In February 2022, Zamber texted Cosby directing that $15,000 be wired to cover payroll obligations for Zamber's medical clinic. In November 2022, Zamber again texted Cosby "[j]ust got a huge surprise at the clinic. I need a $15k wire asap."

53. Cosby executed both transfers using his signatory authority over VPEG's bank account, without any documented inquiry into the purpose or legitimacy of such transfers.

54. In addition to direct payments to VPEG principals, VPEG also funneled over $10 million to its affiliates, including "Visionary Entertainment and Media" and "Visionary Media Group." VPEG also paid an additional $1.2 million in expenses on behalf of these entities.

55. When VPEG personnel questioned payments to these affiliated entities, Cosby refused to provide an explanation. *See Oliver Dkt.* at ECF No. 82, Hrg. Tr., at 112:16–113:9.

56. On other occasions, new investor money that VPEG received was used to fund payment obligations to VPEG's existing investors. For example, on the same day that two $500,000 investments were deposited in VPEG's account, $82,000 was immediately paid to prior investors in Ponzi-like fashion.

57.     VPEG also commingled funds among its portfolio companies, using one company's accounts to satisfy another company's obligations. For example, funds belonging to portfolio company POP! Gourmet were used to pay the payroll obligations of a separate portfolio company, Visionary Vaccination and Health Services, a practice that VPEG personnel flagged to Cosby because it distorted the accounting and tax reporting of both companies. *See Oliver Dkt.* at ECF No. 82, Hrg. Tr., at 62:14–64:8.

58.     At one point, Cosby opened a separate VPEG bank account to keep funds beyond Zamber's immediate reach because of concerns that Zamber would spend them. Although this step reflected Cosby's awareness of Zamber's use of Fund assets, Cosby did not disclose that conduct to investors or prevent the continued transfers described above. *See Oliver Dkt.* at ECF No. 82, Hrg. Tr., at 114:16–115:21.

## V.     VPEG's Inflated Portfolio Company Valuations

59.     VPEG's LPA requires that the Fund undergo annual audits by independent certified public accountants. Despite this mandate, VPEG has not been independently audited since 2011.

60.     In the absence of these required audits, VPEG's investor updates reported the estimated value of its portfolio companies using a self-created, self-serving "mark to market" method that essentially valued the portfolio companies at multiples of VPEG's invested basis. According to the Receiver, this methodology "is not generally used for valuing privately held companies" and did not appear to be supported by independent third-party analysis or market-based metrics.

61.     As a result, the valuations and projections VPEG shared with investors bore no relationship to the actual condition of the underlying companies:

a.   **POP! Gourmet:** VPEG's insider Grenley was CEO of POP! Gourmet. VPEG has invested approximately $2.2 million of investor capital in POP! Gourmet since

13

January 2021. VPEG improperly valued its position in POP! Gourmet at $5 million and projected $10 million in distributions from POP! Gourmet in 2027. In reality, POP! Gourmet underwent a bankruptcy proceeding in 2020, had no employees (the result of missing multiple payroll periods for several employees), had no manufacturing operations for over two years, and was in the process of a sheriff's sale to satisfy an approximate $353,000 judgment at the time of the VPEG Receiver's appointment. Around this same time it was revealed that POP! Gourmet's website and its QuickBooks had been shut down due to financial difficulties, that the company had under $10,000 cash, owed VPEG approximately $5.4 million, and had negative equity of $6.4 million.

b. **Victory Clean Energy:** VPEG invested approximately $840,500 in Victory Clean Energy, a publicly-traded over-the-counter stock with a last known price of $0.0002 per share. VPEG marketed this company as a major component of its internal valuation, valuing its position at approximately $19 million – more than 22x what VPEG invested – and projecting distributions from Victory Clean Energy of $5 million to $50 million per year from 2025-2027. In 2024 Victory Clean Energy reported nearly $7.8 million in accumulated losses and expressed doubt about its ability to continue as a going concern.

c. **Shop4E:** VPEG invested approximately $376,000 in Shop4E, another company for which Grenley served as CEO. In 2021, 2022, and 2023, Shop4E had zero revenue and over $2.5 million in negative retained earnings. Its bank account was closed for inactivity in April 2024. Nonetheless, VPEG valued its position in Shop4E at $4.1 million (more than 10x the amount that VPEG invested) and projected $10 million in distributions from Shop4E in 2027.

d. **Visionary Vaccination and Health Services ("VVHS"):** VPEG invested approximately $1 million in VVHS since January 2021. VVHS was a vaccination clinic that generated little, if any revenue, possessed assets consisting primarily of seven laptops and two freezers, and was not operating at the time the VPEG Receiver was appointed. As of December 2024, VPEG valued its position in VVHS to be approximately $1.2 million, apparently reflecting valuations of nearly $150,000 per laptop or freezer.

e. **Visionary Media Group and Visionary Entertainment and Media:** VPEG invested at least $10.2 million in these two companies since January 2021. VPEG valued its position in Visionary Media Group at approximately $15.7 million and projected distributions to be approximately $10 million in 2026 and $60 million in 2027. These VPEG affiliates combined for losses exceeding $7.8 million with minimal revenue. Visionary Media Group's former Director of Operations, Kevin Huss, confirmed that the company "failed to pay its employees" and vendors.

f. **Navitus Energy Group:** VPEG invested over $5 million in this company, yet the Fund's principals provided no substantial reporting to investors about this major investment.

14

62.     The pattern is clear: VPEG systematically inflated the value of its portfolio using unsupported, if not entirely bogus, valuation methodologies that ignored the actual financial condition and operational status of these companies, and disseminated projected distribution timelines and amounts that were entirely disconnected from reality. This was not mere puffery; VPEG's statements and actions were designed to induce investors to contribute capital and/or maintain their investments in the Fund.

63.     As an attorney, Cosby was well aware that VPEG's presentation of its financials, including the values of its portfolio companies, was not defensible. He was also well aware of the need to maintain separation between VPEG's finances and those of its owners, its portfolio companies, and affiliates. Cosby routinely disregarded this separation and actively concealed this commingling from investors. In spite of this knowledge, Cosby personally disseminated unaudited, non-compliant financial "statements" (using his Husch Blackwell email). *See Oliver Dkt.* at ECF No. 82, Hrg. Tr., at 168:20–173:22.

## VI.     VPEG's Collapse

64.     As a result of the mismanagement and misappropriation of Fund assets detailed above, VPEG's financial condition deteriorated until the Fund was effectively insolvent.

65.     By the end of 2023, VPEG had only approximately $218,000 in its bank accounts and had suffered net losses exceeding $10 million.

66.     VPEG soon became unable to pay even the most basic operating expenses. By the time the Receiver was appointed, VPEG owed hundreds of thousands of dollars to contractors and vendors. VPEG's rent at its St. Charles, Missouri office space was in arrears by at least $35,000, and its insurance coverage lapsed.

15

67.    VPEG also failed to meet its obligations to IRA investors, who were owed approximately $100,000 in required minimum distributions in 2024 and approximately $81,000, along with approximately $14,000 in accumulated penalties, in 2025.

68.    On January 29, 2025, the City of St. Charles, Missouri issued a notice that VPEG was operating without a valid business license, ordering VPEG to "cease operation."

69.    By August 2025, VPEG's cash balance reached $0.

70.    VPEG incurred substantial debt to conceal its failing operations. Although Zamber and Grenley spent years telling investors that VPEG carried "no debt at the Fund level," this was not true, as a lender named "The Funding Family" disclosed in a UCC financial statement in November 2024 that VPEG had taken on institutional debt obligations. Remarkably, on the same date this lien was publicly recorded, Zamber texted Cosby to extract another "10k wire to RZ" [*i.e.*, Ronald Zamber].

71.    Throughout this time, and despite VPEG's dire financial condition, VPEG continued to solicit new investors. The VPEG subscription booklet provided to JLP in connection with its VPEG investment prominently identified Husch Blackwell and directed completed subscription documents and investor questions to Cosby at Husch Blackwell's Springfield, Missouri office.

**VII.    VPEG Concealed its Collapse from Current and Prospective Investors**

72.    VPEG took steps to conceal the Fund's true financial condition from investors and other stakeholders.

73.    According to the Receiver, VPEG's Managing Director and Director of Investor Relations, Brigette Bonetti, had her access to financial information and the Fund's bank account "cut off for long periods of time" beginning in 2018. According to the Receiver, Visionary Media

16

Group's former Director of Operations, Kevin Huss, ultimately departed because he was asked to rewrite reports "in a more favorable light" so as to mislead investors.

74.     Likewise, contractors who previously had access to VPEG and portfolio company financials had their access removed around 2021.

75.     VPEG has also been sued by a group of investors alleging, amongst other things, that VPEG's principals, including Cosby, "have refused to provide financial information about the Fund, and when such information is provided, it has been incomplete and deficient such that it fails to even show the payments that the Individual Defendants have received and other pertinent details." *See* Oliver Dkt. at ECF No. 177  at ¶ 2 (Third Am. Compl., filed Sept. 5, 2025).

## VIII.   Appointment of a Receiver over VPEG

76.     On June 4, 2025, a Receiver was appointed over VPEG and Visionary Fund Manager, LLC following findings of "gross mismanagement, self-dealing, and the Fund's apparent insolvency." Oliver Dkt. at ECF No. 88, p. 10. The Court specifically found an "imminent danger of further dissipation" of Fund assets. *Id.* at p. 21.

77.     The Court also found that Zamber and Cosby had siphoned funds from VPEG's accounts for apparent personal use through indiscriminate and likely covert methods. *See id.* The Court likewise determined that Zamber and Grenley made "repeated material misrepresentations to investors regarding the financial health of VPEG, the likelihood of liquidity events, the amount of incoming capital contributions, and the imminent closure of the fund." *See id.* Presiding Judge Matthew T. Schelp stated on the record that the VPEG principals' conduct "sounds criminal to me."  Oliver Dkt. at ECF No. 82 at 193:25 (Hrg. Tr. dated April 28, 2025).

78.     The Receiver's subsequent investigation, detailed in a September 23, 2025 report, confirmed and expanded upon these findings. Among other conclusions, the Receiver found that a

17

significant portion of VPEG investors' capital was used to pay VPEG's principals and to cover losses in affiliated companies.

## IX.   Cosby's and Husch Blackwell's Intimate and Direct Involvement in VPEG's Misconduct

79.   As VPEG's Senior Managing Director and General Counsel, Cosby's involvement in the Fund's operations was far from limited to providing legal advice to the Fund.

80.   Cosby played a central role in the Fund's operations including, but not limited to:

a.   co-managing and co-controlling VPEG's bank accounts with Zamber, including exercising signatory authority over such accounts;

b.   executing illicit wire transfers at Zamber's direction, including transfers of investor funds to Zamber for personal expenditures as well as improper transfers to other VPEG affiliates;

c.   preparing VPEG's tax filings and overseeing preparation of VPEG's financial records; and

d.   serving as the designated "Phone Advisor" for investor wires, with Cosby's contact information at Husch Blackwell listed in the subscription booklet used for JLP's and others' VPEG investments.

81.   Husch Blackwell, through Cosby and the use of its office and systems, played a central and substantial role in connection with JLP's and others' investments in VPEG. The subscription booklet directed completed subscription materials and investor questions to Cosby at Husch Blackwell's Springfield, Missouri office.

82.   VPEG's former Managing Director and Director of Investor Relations, Brigette Bonetti, has testified under oath that Zamber and Cosby were the only decision-makers regarding VPEG's expenditures, and further, that nobody else in the company ever had visibility into those expenses. *See Oliver Dkt.* at ECF No. 82, Hrg. Tr., at 108:9–14.

83.   Disgruntled investors contacted Cosby directly on his Husch Blackwell phone number and email address to voice their complaints concerning VPEG. Those complaints were

18

received by Cosby through Husch Blackwell's communications systems. *See Oliver Dkt.* at ECF No. 82, Hrg. Tr., at 140:19–22.

84.     Husch Blackwell knew of and permitted Cosby's involvement in VPEG. That inference is supported by Husch Blackwell's representation of VPEG, its receipt of legal fees from the Fund, Cosby's public and disclosed VPEG roles, and his use of Husch Blackwell's offices, communications systems, and other resources to conduct VPEG business.

85.     Cosby's subscription-related and legal activities for VPEG were undertaken as part of, or at a minimum apparently as part of, his work as a Husch Blackwell partner. Cosby openly held himself out as a Husch Blackwell partner, and the subscription booklet used for JLP's and others' investments identified the firm's name, office, and contact information and directed investors to Cosby at Husch Blackwell.

86.     Cosby even conducted his VPEG-related activities on his Husch Blackwell-issued cell phone. Consistent therewith, the Receiver's investigation later established that Husch Blackwell possessed the above-referenced text messages between Zamber and Cosby, confirming that those communications were maintained within firm-controlled systems.

87.     VPEG raised approximately $90 million from approximately 1,000 investors. At least by May 2023, VPEG's subscription booklet directed completed subscription documents and investor questions to Cosby at Husch Blackwell's Springfield, Missouri office.

88.     Cosby profited personally from these investments. Since January 2021, Cosby has received approximately $655,000 in direct payments from VPEG. As co-owner of VFM, Cosby also had a financial interest in the approximately $1.6 million that VPEG paid to VFM since 2021.

89.     Husch Blackwell's relationship to VPEG was not limited to Cosby's use of firm resources. The VPEG subscription booklet provided to JLP and others expressly identified Husch

19

Blackwell as the Fund's "legal counsel in connection with the management and operation of the Partnership, including, without limitation, making, holding, and disposing of investments." The Receiver's September 23, 2025 report also identifies at least fourteen payments from VPEG to Husch Blackwell categorized as legal fees.

90.    After VPEG's misconduct was exposed, Ryan Mitchem of Husch Blackwell's General Counsel's office sent Cosby eleven messages concerning his VPEG involvement. By late November or early December 2025, Husch Blackwell's executive board had decided that Cosby would no longer remain a partner of the firm. Cosby testified that Joe Glynias informed him of that decision by telephone and that subsequent communications concerning his departure date occurred through Husch Blackwell's email server. *See Oliver Dkt.* at ECF No. 278-11, Cosby Dep. Tr. Vol. 2, at 277:9–279:6 (Mar. 13, 2026).

**X.    Husch Blackwell Is Bound by and Liable for Cosby's Conduct as Its Partner and Agent**

91.    Cosby was at all relevant times a partner of Husch Blackwell. Under applicable partnership and agency law, a partner acts as an agent of the partnership with respect to partnership business. A partnership may be liable for the wrongful acts, omissions, or other actionable conduct of a partner undertaken in the ordinary course of the partnership's business or with the partnership's actual or apparent authority. A partner's knowledge of facts relating to partnership matters may likewise be attributable to the partnership.

92.    Husch Blackwell served as VPEG's operational counsel. The subscription booklet used for JLP's and others' VPEG investments identified Husch Blackwell as legal counsel in connection with the management and operation of the Fund, directed completed subscription materials to Cosby at Husch Blackwell's Springfield, Missouri office, and represented that accepted subscribers would receive an opinion from Husch Blackwell. The Receiver's records also

20

identify payments from VPEG to Husch Blackwell categorized as legal fees. Cosby, in turn, conducted his VPEG activities using Husch Blackwell's office, address, telephone, email, and systems, and held himself out to investors as a Husch Blackwell partner.

93.     At minimum, Cosby's VPEG subscription-related and legal activities were undertaken in the ordinary course of Husch Blackwell's business or within the actual or apparent authority of Husch Blackwell. Husch Blackwell knew of and permitted Cosby's VPEG role, maintained the VPEG legal engagement, permitted Cosby to use the firm's name, office, and communications systems in connection with VPEG, and received legal fees from the Fund. Accordingly, Cosby's actionable conduct undertaken in that capacity is attributable to Husch Blackwell under applicable partnership and agency law.

**PLAINTIFF'S ALLEGATIONS**

94.     In the spring of 2023, Plaintiff, through member Benezra-Arron, was introduced directly to VPEG's Director of Capital Development, Robert Grenley. The two became friendly, and Grenley eventually extended Plaintiff an "opportunity" to invest in VPEG.

95.     Among the materials Grenley provided to JLP before its investment was a May 2023 presentation titled "Why VPEG? Why Now?" That presentation represented that, as of the first quarter of 2023, VPEG's portfolio had a mark-to-market valuation equal to 1.72 times invested capital and an estimated fair market value equal to 3.23 times invested capital. It also described the Fund as "mature, well into its 'harvest season,'" and represented that the next distribution to limited partners was expected in the fourth quarter of 2023.

96.     These representations were materially misleading when made. The stated valuation multiples were unaudited and were derived from VPEG's internally created valuation methodology without disclosing that VPEG had not undergone an independent audit since 2011. The

21

presentation also failed to disclose the transfers of Fund assets to insiders and affiliated entities, the absence of reliable independent valuation support, and the financial and operational conditions affecting portfolio companies that undermined the stated valuations and anticipated liquidity events.

97.     JLP also received VPEG's PPM, dated February 12, 2010 and supplemented through May 15, 2013. VPEG did not provide JLP with any later amendment or supplement. The PPM stated that it would be amended or supplemented appropriately if a material change in the Fund's affairs occurred while the PPM was required to be delivered. Nevertheless, the PPM provided to JLP in 2023 was not updated to disclose the absence of independent audits since 2011, VPEG's unsupported valuation practices, the transfers of Fund assets to insiders and affiliated entities, or the basis and classification of payments to VFM in light of the PPM's provisions governing reporting, audit coordination, overhead, and Fund expenses.

98.     VPEG is not a public company, and the information provided by Grenley and contained in VPEG's offering and marketing materials was therefore the principal information available to Plaintiff in making its investment decision.

99.     In reliance on the foregoing, on May 12, 2023, Laurie Benezra-Arron, as a member of JLP, executed a subscription agreement identifying JLP as the subscriber for a $100,000 investment in VPEG. JLP also submitted a Form W-9 identifying JLP as the taxpayer. JLP submitted its signed subscription materials to Cosby at Husch Blackwell's Springfield, Missouri office, and tendered the required funds.[1]

---

[1] Laurie Benezra-Arron, a member of JLP, separately invested $100,000 in VPEG in her individual capacity. That separate investment is not asserted as part of JLP's individual claim in this action, although Benezra-Arron is a member of the proposed Class with respect to that investment.

100. Plaintiff's investment in VPEG was subject to the obligations and duties imposed by the LPA and applicable law. Prior to the appointment of the VPEG Receiver, Plaintiff was not aware that VPEG was breaching its obligations and duties to Plaintiff and other VPEG investors and otherwise misleading them as discussed at length *supra*.

101. Plaintiff has received a single distribution from VPEG. Given VPEG's receivership and financial condition, there is no reasonable path for Plaintiff to recoup its investment.

102. JLP has standing to assert the claims alleged herein. JLP made the $100,000 investment described above through its member Laurie Benezra-Arron and owns, and has at all relevant times owned, the resulting limited partnership interest in VPEG. Consistent with that ownership, VPEG issued a 2024 Schedule K-1 identifying JLP as a limited partner and reflecting JLP's partnership interest and capital account. JLP seeks relief for the losses it sustained as a result of the conduct alleged herein, and its claims are typical of those of the Class it seeks to represent.

## CLASS ACTION ALLEGATIONS

103. Plaintiff brings this action individually and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

104. The proposed class Plaintiff seeks to represent (the "Class") is defined as:

All persons and entities that purchased or acquired limited partnership interests in VPEG during the period from VPEG's formation through June 4, 2025, by means of subscription materials that were directed to, processed through, and/or bore the name of Husch Blackwell.

Excluded from the Class are Defendant and its affiliates, partners, officers, and directors, VPEG's principals (Zamber, Grenley, and Cosby) and their immediate family members, and any judge assigned to this matter.

105. **Numerosity:** VPEG had approximately 1,000 investors. The Class consists of those investors whose purchases satisfy the Husch Blackwell-related criteria stated in the Class

23

definition. The precise number of Class members is ascertainable from VPEG's and Husch Blackwell's records, and the Class is sufficiently numerous that joinder is impracticable.

106.    **Commonality:** Common questions of law and fact include:

a.  the nature and extent of Husch Blackwell's role in VPEG's offering and subscription process;

b.  whether Cosby knew of and affirmatively assisted VPEG's alleged fraud and fiduciary breaches;

c.  whether Cosby's knowledge and conduct are attributable to Husch Blackwell under applicable partnership and agency law;

d.  whether Husch Blackwell knowingly and substantially assisted the alleged misconduct; and

e.  whether Husch Blackwell directly or indirectly controlled Cosby's conduct in offering and selling VPEG interests under Mo. Rev. Stat. § 409.5-509(g)(1).

107.    **Typicality:** Plaintiff's claims are typical of the Class because Plaintiff purchased a VPEG limited partnership interest through a subscription process that satisfied the Husch Blackwell-related criteria stated in the Class definition and was exposed to the same core omissions concerning VPEG's use of investor capital, insider payments, lack of independent audits, and unsupported financial reporting.

108.    **Adequacy:** Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff has no conflicts of interest with other Class members, and has retained counsel with extensive experience representing victims of investment fraud in complex, high-profile class and other large group actions and arbitrations across the country.

109.    **Predominance and Superiority:** Common questions of law and fact predominate over individual issues. A class action is superior to other methods of adjudication because the claims of individual investors, while substantial in the aggregate, may be insufficient to justify the cost of individual litigation against a defendant of Husch Blackwell's size and resources. The

24

median individual investment in VPEG was approximately $30,000, and over 80% of investors contributed less than $100,000.

## CAUSES OF ACTION

### COUNT I
#### AIDING AND ABETTING FRAUD

110. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

111. VPEG defrauded Plaintiff and the Class in numerous ways described below.

112. In connection with its solicitations and sales of limited partnership investments to investors, VPEG misrepresented that investor capital would be directed to a portfolio of promising private companies in diverse sectors. VPEG further misrepresented that said portfolio was performing well, with substantial valuations based on sound accounting principles, and was poised to return distributions of tens, if not hundreds, of millions of dollars to VPEG's investors, as all described in more detail above.

113. Likewise, in connection with these same sales and solicitations, VPEG omitted to disclose that at all relevant times hereto the Fund's principals were in fact misappropriating investor money by misdirecting VPEG's capital to themselves and/or to other entities they owned or controlled for their personal benefit. VPEG likewise failed to disclose that its financials were not audited, and that its portfolio company valuations and projections were not based on sound accounting principles and were thus grossly and improperly inflated, again as described in more detail above.

114. VPEG knew these misleading representations were false, and/or made them with reckless disregard for their truth or veracity.

115. VPEG made these misrepresentations and omissions with the intent to induce Plaintiff and the Class to purchase limited partnership interests and, where applicable, contribute additional capital.

116. Such misrepresentations and omissions, which were made and/or carried out by VPEG through its offering and marketing materials, and also through its principals Zamber, Grenley, and Cosby through their statements, actions, and inactions, were material. Disclosure of any of the misleading information about how funds were spent, portfolio companies were valued, or otherwise, would have affected investors' decisions to invest in VPEG.

117. Plaintiff and the Class justifiably relied on such misstatements and omissions described herein when purchasing their investments in VPEG.

118. Husch Blackwell had actual knowledge of VPEG's and its principals' fraud on the basis of the facts alleged above and summarized below.

119. Husch Blackwell's partner, Cosby, prepared VPEG's tax filings, co-controlled VPEG's bank accounts with Zamber, and executed wire transfers of investor funds to VPEG's principals and entities they controlled. Cosby therefore had actual knowledge of VPEG's and its principals' fraud. The facts known to Cosby concerning that misconduct related to Husch Blackwell's representation of VPEG and to the VPEG matters in which Cosby acted through the firm. Accordingly, Cosby's knowledge is attributable to Husch Blackwell under applicable partnership and agency law.

120. Husch Blackwell had actual knowledge of the nature and scope of its own VPEG engagement and knew that VPEG's subscription booklet identified the firm as operational counsel, directed completed subscription materials and investor questions to Cosby at the firm's Springfield office, and represented that accepted subscribers would receive an opinion from Husch Blackwell.

26

121.    Husch Blackwell also had actual knowledge of the misconduct alleged above through Cosby, whose knowledge is attributable to the firm as alleged above. Cosby possessed that knowledge while simultaneously performing work on Husch Blackwell's VPEG engagement and managing VPEG's finances, accounts, reporting, and subscription process.

122.    In spite of this knowledge, Husch Blackwell substantially assisted VPEG's and its principals in the commission of their fraud by permitting Cosby to use the firm's name, office, and communications systems in VPEG's subscription process. Throughout this time, Husch Blackwell allowed its name and institutional standing to be used by VPEG and its principals, including Cosby, to lend legitimacy to VPEG's investment offerings.

123.    Husch Blackwell's partner, Cosby, likewise substantially assisted VPEG and its other principals in carrying out and concealing their fraud. While using Husch Blackwell-provided communications systems and resources, Cosby executed and facilitated transfers of VPEG's funds to its principals and affiliates, prepared and disseminated financial information, and participated in the subscription process through which VPEG obtained additional investor capital.

124.    Husch Blackwell's and Cosby's assistance was active and affirmative, and did not consist of mere inaction or the passive provision of routine professional services. Among other things, Cosby personally executed wire transfers dissipating investor funds, co-controlled the Fund's bank accounts and opened a separate account to keep investor funds beyond Zamber's immediate reach, prepared and personally disseminated false and misleading financial statements, and operated the subscription machinery through which VPEG raised investor capital. This affirmative conduct materially distinguishes the claim from one based solely on inaction or the routine provision of professional services.

27

125. In addition, Cosby knowingly and substantially assisted VPEG's and its principals' fraud through the affirmative conduct alleged above. To the extent that Cosby undertook that conduct in the ordinary course of Husch Blackwell's business or with the actual or apparent authority of Husch Blackwell, his wrongful acts of assistance are attributable to Husch Blackwell under applicable partnership and agency law.

126. Husch Blackwell's knowing and substantial assistance of VPEG's and its principals' fraud as described above was a direct and proximate cause of Plaintiff's and the Class's damages. Husch Blackwell's assistance enabled VPEG to present itself as a legitimate investment fund, complete investor subscriptions, obtain additional capital, divert investor funds, and continue concealing its fraud. Husch Blackwell's involvement and assistance were not incidental, but rather were foundational to VPEG's fraudulent operations and Plaintiff's and the Class's inability to detect them.

127. As a direct and proximate result of Husch Blackwell's aiding and abetting VPEG's and its principals' fraud, Plaintiff and the Class suffered damages.

## COUNT II
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

128. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

129. Visionary PE GP I, LLC, as VPEG's general partner, and the persons and entities controlling and managing VPEG, including VFM, Zamber, and Cosby to the extent applicable to their respective roles, owed fiduciary duties to VPEG's limited partners, including the duties of loyalty, care, and candor.

130. The fiduciaries identified above further breached their fiduciary duties by misrepresenting that investor capital would be directed to a portfolio of promising private

28

companies in diverse sectors. They further misrepresented that said portfolio was performing well, with substantial valuations based on sound accounting principles, and was poised to return distributions of tens, if not hundreds, of millions of dollars to VPEG's investors, as all described in more detail above. The fiduciaries perpetrated these breaches through the dissemination of VPEG's marketing materials and also through the statements and actions of principals Zamber, Grenley, and Cosby.

131.    Additionally, the fiduciaries identified above breached their fiduciary duties by omitting to disclose that at all relevant times hereto the Fund's principals were in fact misappropriating investor money by misdirecting VPEG's capital to themselves and/or to other entities they owned or controlled for their personal benefit. The fiduciaries also failed to disclose that the Fund's financials were not audited, and that its portfolio company valuations and projections were not based on sound accounting principles and were thus grossly and improperly inflated, again as described in more detail above. They perpetrated these breaches through the dissemination of VPEG's marketing materials and also through the statements and actions of principals Zamber, Grenley, and Cosby.

132.    The fiduciaries identified above further breached their fiduciary duties to investors by misappropriating VPEG assets for the benefit of the Fund's principals and entities owned or controlled by them, and by disseminating unsupported valuations and projections designed to conceal VPEG's deterioration and collapse, as described above.

133.    Plaintiff and the Class seek relief in this Count for the direct injury caused by the fiduciaries' material misrepresentations, omissions, and concealment from limited partners. The allegations concerning the diversion of Fund assets also demonstrate the underlying breaches and

29

Husch Blackwell's knowledge and assistance; Plaintiff and the Class do not seek in this action to recover assets belonging to VPEG.

134. Husch Blackwell had actual knowledge of the fiduciary breaches alleged above and summarized below.

135. Husch Blackwell's partner, Cosby, prepared VPEG's tax filings, co-controlled VPEG's bank accounts with Zamber, and executed wire transfers of investor funds to VPEG's principals and entities they controlled. Cosby therefore had actual knowledge of the fiduciary breaches alleged above. The facts known to Cosby concerning those breaches related to Husch Blackwell's representation of VPEG and to the VPEG matters in which Cosby acted through the firm. Accordingly, Cosby's knowledge is attributable to Husch Blackwell under applicable partnership and agency law.

136. Husch Blackwell had actual knowledge of the nature and scope of its own VPEG engagement and knew that VPEG's subscription booklet identified the firm as operational counsel and placed the firm and Cosby within the subscription process.

137. Husch Blackwell also had actual knowledge of the fiduciary breaches alleged above through Cosby, whose knowledge is attributable to the firm as alleged above. Cosby possessed that knowledge while simultaneously performing work on Husch Blackwell's VPEG engagement and managing VPEG's finances, accounts, reporting, and subscription process.

138. Husch Blackwell substantially assisted the fiduciary breaches by permitting Cosby to use the firm's name, office, and communications systems in VPEG's subscription process. Throughout this time, Husch Blackwell allowed its name and institutional standing to be used to lend legitimacy to VPEG's investment offerings.

30

139. Husch Blackwell's partner, Cosby, also substantially assisted the fiduciary breaches by executing wire transfers from VPEG's accounts to VPEG's principals and affiliates.

140. As with the fraud alleged above, Husch Blackwell's and Cosby's assistance in VPEG's breaches of fiduciary duty was active and affirmative rather than passive. Cosby exercised signatory control over the Fund's accounts, executed the wire transfers that effected the breaches, prepared and disseminated misleading financial information, and administered the subscription process—conduct amounting to knowing and substantial participation in the breaches.

141. In addition, Cosby knowingly and substantially assisted the fiduciary breaches alleged above through his affirmative conduct. To the extent that Cosby undertook that conduct in the ordinary course of Husch Blackwell's business or with the actual or apparent authority of Husch Blackwell, his wrongful acts of assistance are attributable to Husch Blackwell under applicable partnership and agency law.

142. Husch Blackwell's knowing and substantial assistance of the fiduciary breaches alleged above was a direct and proximate cause of Plaintiff's and the Class's damages. Husch Blackwell's assistance enabled VPEG to present itself as a legitimate investment fund, complete investor subscriptions, obtain additional capital, divert investor funds, and continue concealing the fiduciary breaches. Husch Blackwell's involvement and assistance were not incidental, but were foundational to the breaches and to Plaintiff's and the Class's inability to detect them.

143. As a direct and proximate result of Husch Blackwell's aiding and abetting VPEG's and its principals' breaches of fiduciary duty, Plaintiff and the Class suffered damages.

## COUNT III
### VIOLATION OF THE MISSOURI SECURITIES ACT, MO. REV. STAT. § 409.5-509

144. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

31

145.     Pursuant to Mo. Rev. Stat. § 409.5-509(b), a person is liable to the purchaser if the person sells a security "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading, the purchaser not knowing the untruth or omission and the seller not sustaining the burden of proof that the seller did not know and, in the exercise of reasonable care, could not have known of the untruth or omission."

146.     Cosby was the primary violator and a "seller" of VPEG securities within the meaning of § 409.5-509(b). As VPEG's Senior Managing Director and the person designated to oversee its subscription process, Cosby participated in effecting the sales of VPEG limited partnership interests. He was the designated recipient of completed subscription materials, the designated contact for investor questions, and the designated "Phone Advisor" for investor wires. Consistent with those responsibilities, JLP submitted its signed subscription materials to Cosby at Husch Blackwell's Springfield, Missouri office. Cosby performed these functions for the financial benefit of himself, VPEG, and entities he owned or controlled and was directly and materially involved in the offer and sale of the securities at issue.

147.     In the alternative, VPEG was itself a primary violator and "seller" of the securities at issue. As the issuer of the limited partnership interests, VPEG sold those interests to Plaintiff and the Class by means of the untrue statements of material fact and material omissions contained in its offering and marketing materials, as described above. Plaintiff therefore alleges, in the alternative, that Cosby and VPEG are each persons liable as sellers under § 409.5-509(b). Husch Blackwell's alleged control-person liability under § 409.5-509(g)(1), however, is predicated on its direct or indirect control of Cosby, as alleged below, and not on control of VPEG.

32

148.     The sales alleged above were made by means of offering and marketing materials that misrepresented how investor contributions would be used by the Fund. Investors were told that VPEG would use their funds to invest in promising companies, while the materials omitted that investor funds were being and would continue to be transferred to VPEG's principals and affiliated entities for personal or inadequately disclosed purposes.

149.     The sales were also made by means of materially misleading valuation statements and distribution projections. Those statements and projections lacked a reasonable basis and omitted material facts concerning the portfolio companies' operations, profitability, and ability to generate the projected liquidity events, as alleged above.

150.     These statements and omissions were material because a reasonable investor would consider them important in deciding whether to purchase a VPEG limited partnership interest. JLP did not know of the untruths and omissions when it purchased its interest.

151.     Pursuant to Mo. Rev. Stat. § 409.5-509(g), "[a] person that directly or indirectly controls a person liable under subsections (b) through (f)" is liable jointly and severally with and to the same extent as Cosby.

152.     Husch Blackwell possessed the right, power, and practical ability to supervise and control Cosby in connection with work he performed through the firm for VPEG, including his use of the firm's name, office, personnel, communications systems, legal work product, and client engagement in connection with the offer and sale of VPEG interests. Husch Blackwell exercised institutional control over Cosby's firm-based conduct by maintaining the VPEG legal engagement and permitting Cosby to use the firm's name, office, personnel, communications systems, and other resources in the subscription process.

153.    Husch Blackwell also possessed the authority to restrict Cosby's use of those firm resources, prohibit the use of the firm's name and office in VPEG's offerings, cease receiving subscription materials through its office, limit or terminate the firm's VPEG engagement, and terminate Cosby's status as a firm partner. Husch Blackwell's executive board ultimately exercised that authority by deciding that Cosby would no longer remain a partner.

154.    Through these powers and its institutional role, Husch Blackwell directly or indirectly controlled  Cosby's participation in the offer and sale of VPEG interests. The subscription booklet used for JLP's and others' investments directed completed subscription materials and investor questions to Cosby at the firm's Springfield, Missouri office. Cosby participated in effecting the offer and sale of VPEG interests while acting as a Husch Blackwell partner and using the firm's office and communications systems.

155.    Husch Blackwell cannot sustain the burden of proof that it did not know and, in the exercise of reasonable care, could not have known, of the existence of conduct by reason of which the liability is alleged to exist. As described herein, VPEG's subscription booklet placed the firm and Cosby within the subscription process, and Cosby carried out much of the misconduct that harmed investors.

156.    JLP's offer to purchase was made in Missouri within the meaning of Mo. Rev. Stat. § 409.6-610 because the subscription booklet directed JLP to submit its completed subscription materials to Cosby at Husch Blackwell's Springfield, Missouri office, and JLP submitted its signed materials through that process. VPEG thereafter accepted JLP as a limited partner, as confirmed by the 2024 Schedule K-1 issued in JLP's name. Upon information and belief, based on the designated Springfield submission process and Cosby's role in administering subscriptions, JLP's

34

offer was accepted in Missouri. Plaintiff asserts this Count only on behalf of those Class members whose transactions satisfy the jurisdictional requirements of Mo. Rev. Stat. § 409.6-610.

157.    JLP's claim is timely under Mo. Rev. Stat. § 409.5-509(j) because this action is brought within two years after JLP discovered the facts constituting the violation—which JLP did not discover, and in the exercise of reasonable care could not have discovered, until the Receiver's appointment and investigation in 2025—and within five years after JLP's purchase. Plaintiff asserts this Count only on behalf of those Class members who purchased VPEG limited partnership interests during the five-year period preceding the filing of this action through June 4, 2025.

158.    JLP continues to own its VPEG limited partnership interest and hereby tenders, and remains willing to tender, that interest in exchange for the consideration recoverable under Mo. Rev. Stat. § 409.5-509(b)(1). To the extent any Class member has disposed of his or her VPEG interest, that member seeks actual damages as provided in Mo. Rev. Stat. § 409.5-509(b)(3).

159.    Accordingly, Plaintiff and those Class members covered by this Count are entitled to rescission, damages, reasonable attorneys' fees, and costs under Mo. Rev. Stat. § 409.5-509(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class as defined herein, respectfully requests that this Court enter judgment against Husch Blackwell LLP as follows:

a.  Certify this action as a class action under Federal Rule of Civil Procedure 23, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

b.  Award compensatory damages in an amount to be determined at trial, and statutory rescission or actual damages under Mo. Rev. Stat. § 409.5-509(b), as applicable, subject to deductions for income received, other applicable offsets, and the avoidance of duplicative recovery;

c.  Award interest pursuant to Mo. Rev. Stat. § 409.5-509(b)(1);

d.  Award costs pursuant to Mo. Rev. Stat. § 409.5-509(b)(1);

e.  Award reasonable attorneys' fees pursuant to Mo. Rev. Stat. § 409.5-509(b)(1);

f.  Award punitive and all other damages to the extent permitted by law;

g.  Award such other and further relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 13, 2026                    Respectfully submitted,

By: */s/ Brandon M. Wise*
Brandon M. Wise – MO Bar #67242
Domenica Russo – MO Bar #74819
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
T: 314-833-4825
bwise@peifferwolf.com

Daniel Centner*
Carson Kern*
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
935 Gravier Street, Suite 1600
New Orleans, Louisiana 70112
T: 504-605-2234
dcentner@peifferwolf.com
ckern@peifferwolf.com

Scott Silver*
Ryan Schwamm*
Peter Spett*
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, Florida 33065
T: 954-755-4799
ssilver@silverlaw.com
rschwamm@silverlaw.com
pspett@silverlaw.com

*(*pro hac vice* forthcoming)